UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DURROD WATKINS,                                    DECISION AND ORDER

                              Plaintiff,            13-CV-6386 CJS

          -v-

ROCHESTER GENERAL HOSPITAL,

                              Defendant.

---

APPEARANCES

For Plaintiff:              Durrod Watkins, *pro se*
                            P.O. Box 64745
                            Rochester, New York 14624

For Defendant:              Daniel Moore
                            Harris Beach LLP
                            99 Garnsey Road
                            Pittsford, New York 14534

INTRODUCTION

Durrod Watkins ("Plaintiff") was employed by Rochester General Hospital ("RGH") as a member of the Environmental Services team. RGH terminated Plaintiff's employment, and he commenced this action for employment discrimination. Now before the Court is Defendant's motion (Docket No. [#8]) to dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(6). The application is granted and this action is dismissed.

BACKGROUND

At the outset the Court must determine what facts it can consider when ruling upon Defendant's motion. It is of course well-settled that in resolving a 12(b)(6) motion, the Court is limited in what it can consider. *See, e.g.,Vasquez v. City of New York*, No. 10 Civ.

6277(LBS), 2012 WL 4377774 at *1 (S.D.N.Y.Sep. 24, 2012) ("[T]he [general] rule [is] that documents outside the pleadings cannot be considered in a 12(b)(6) motion."). On a 12(b)(6) motion,

> the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-153 (2d Cir.2002) (citations omitted). In considering whether a document is "integral" to the complaint, "a plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Id.*, 282 F.3d at 153 (citation and footnote omitted). When the action involves federal discrimination claims that were filed with an administrative agency before they were brought here, the Court may consider the administrative record when ruling on a 12(b)(6) motion. *See, Holowecki v. Federal Express Corp.*, 440 F.3d 558, 565 (2d Cir. 2006) ("In reviewing the Rule 12(b)(6) ruling, it is proper for this court to consider the plaintiffs relevant filings with the EEOC.]"); *see also*, *Russell v. Aid to Developmentally Disabled, Inc.*, No. 12 CV 389(DRH)(AKT), 2013 WL 633573 at *14, n. 8 (E.D.N.Y. Feb. 20, 2013) ("It is appropriate for the Court to consider [NY]SDHR filings in the context of a Rule 12(b)(6) motion because they are public documents filed in the context of administrative agency proceedings, and because they are integral to plaintiff's claims.") (citations omitted).

Between August 31, 2010 and September 19, 2012, Plaintiff worked as a member of the housekeeping staff at RGH. Plaintiff maintains that during the first year of his

employment he was recognized by RGH for good job peformance.  However, on September 19, 2012, Defendant terminated Plaintiff's employment.  The circumstances leading to the termination of Plaintiff's employment had been evolving for several months prior to that, according to the administrative record.   Specifically, Plaintiff had various performance deficiencies, such as arriving late for work, taking excessive breaks and talking on his cell phone during work hours, which, in March 2011, led Defendant to provide Plaintiff with "extensive, informal coaching on all of these issues."[1]  Plaintiff's performance deficiencies continued, and in January, 2012, Defendant gave Plaintiff a written warning, after he arrived late for work and took improper meal breaks.[2]  Plaintiff's problems persisted, and that in April, 2012, Defendant placed him on a performance improvement plan ("PIP").[3]   In connection with the PIP, Plaintiff was required to submit an improvement plan and to meet regularly with his supervisor.  In both May and June, 2012, Defendant recorded further problems with Plaintiff's performance, involving sitting in a chair and talking on his cell phone, being absent during his shift and failing to report for work after punching in on the time clock.[4]  Additional  problems occurred in August, 2012, and Defendant extended the term of the PIP, and imposed additional monitoring requirements.   For example, the extended PIP required Plaintiff to inform the Unit Secretary or Charge Nurse before leaving and after returning to his work area, and to utilize a computerized program that monitored

---

[1]*See*, Docket No. [#8-1] at p. 14.

[2]*See*, Docket No. [#8-1] at p. 14.

[3]*See*, Docket No. [#8-1] at p. 14.

[4]*See*, Docket No. [#8-1] at pp. 14-15.

3

his work.[5]   Despite these measures, the record indicates that Plaintiff was "tardy and took[6] an extended meal break on virtually every single work day between August 31 and September 26."   On September 28, 2012, Plaintiff's supervisors and a representative from Defendant's Human Resources ("HR")  Office completed a recommendation that Plaintiff's employment be terminated, and forwarded it to RGH's HR Director.   While that recommendation was being considered, on October 3, 2012, Plaintiff again was tardy for work, and was also seen in the facility parking garage during his shift, which prompted Defendant to terminate his employment later that day.[7]

On October 22, 2012, Plaintiff filed a discrimination complaint with the New York State Division of Human Rights ("NYSDHR").[8]  On the form complaint, Plaintiff checked only the box indicating that he was discriminated against on the basis of "race/color or ethnicity."[9] He did not check boxes, for example, "retaliation" or "disability."  Plaintiff indicated that the discriminatory acts consisted of terminating his employment and giving him negative performance reviews.[10]   In the hand-written narrative section of the complaint, Plaintiff indicated, in pertinent part, that the discrimination was caused by his supervisors, "Matt and Tony," and consisted of being placed "under a certain type of surveillance [and] being

---

[5]*See*, Docket No. [#8-1] at p. 15.

[6]*See*, Docket No. [#8-1] at p. 15.

[7]*See*, Docket No. [#8-1] at p. 16.

[8]*See*, Docket No. [#8-1] at pp. 5-9.

[9]*See*, Docket No. [#8-1] at p. 6.

[10]*See*, Docket No. [#8-1] at p. 7.

followed on my breaks."[11]  The narrative further indicated that such scrutiny was improper, since Plaintiff had an "excellent work ethic."[12]

In response to Plaintiff's complaint, Defendant submitted a response to the NYSDHR that detailed the reasons for the termination of Plaintiff's employment, as set forth above.

On December 1, 2012, Plaintiff submitted an 8-page "rebuttal" to the NYSDHR.[13] Plaintiff stated that he was discriminated against for being "a black male," because he believed that he had a good work ethic and that his performance was improving.[14]  Plaintiff further indicated that he did not have complaints about him until Tony Zapata ("Zapata") was hired to supervise the ward on which Plaintiff worked, and that most of the complaints about him came from Zapata.[15]  Plaintiff indicated that he actually was not bothered by having to use the aforementioned software program, which monitored his work, and that he understood why he and other employees were required to do so.[16]  Plaintiff complained, though, that such computer program sometimes resulted in housekeeping staff being blamed for other employees' mistakes.  Plaintiff further stated, in response to Defendant's assertion that he often was delayed in reporting for work after punching in on the time clock,

---

[11]*See*, Docket No. [#8-1] at p. 8.

[12]*See*, Docket No. [#8-1] at p. 8.

[13]*See*, Docket No. [#8-1] at pp. 80-88.

[14]*See*, Docket No. [#8-1] at p. 82.

[15]*See*, Docket No. [#8-1] at p. 83.  As discussed further below, Zapata is apparently the African-American "third supervisor" to whom Plaintiff refers in his submissions in this action.

[16]*See*, Docket No. [#8-1] at p. 85.

that he believed that he had a "grace period."[17]   Additionally, Plaintiff stated that it was improper for Defendant to place him on the extended PIP, since Defendant's records showed that his work performance "appeared to improve briefly in late June and July," "but for some reason they continued their surveillance/monitoring."[18]   Plaintiff further indicated that it was improper for Defendant to require him to report to the Charge Nurse before leaving his work area, since he was the only employee required to do so, and it made him feel "like a criminal who has to report to his probation officer."[19]   Plaintiff's rebuttal did not mention anything concerning sex-based or disability-based discrimination or retaliation.

In his cover letter submitted with the rebuttal, Plaintiff stated that all he wanted was "a chance to be able to do my job right and be treated equally.  *I didn't  see how important this chance is but now I understand clearly and with another opportunity I can show improve [sic] that I can handle any requirements that's ask[ed] of me*." (emphasis added).

On March 28, 2013, the NYSDHR issued a "Determination and Order After Investigation," which found  "no probable cause to believe that [the hospital] has engaged in or is engaging in the unlawful practice complained of," and dismissed the complaint.  On April 26, 2013, the U.S. Equal Employment Opportunity Commission ("EEOC") adopted the NYSDHR's findings and issued Plaintiff a "right to sue" letter.

On July 26, 2013, Plaintiff, proceeding *pro se*, commenced this action, using the Court's form "Discrimination Complaint."  When asked to designate the statute under which he was suing, Plaintiff checked only the box for the Americans with Disabilities Act ("ADA")

---

[17] *See*, Docket No. [#8-1] at p. 86.

[18] *See*, Docket No. [#8-1] at p. 87.

[19] *See*, Docket No. [#8-1] at p. 88.

and not the boxes for Title VII or the Age Discrimination in Employment Act ("ADEA").  Later in the Complaint, though, Plaintiff checked boxes indicating that he was discriminated against on the basis of his sex, but not disability.[20]  Plaintiff indicated that the discriminatory acts consisted of terminating his employment, harassing him, and retaliating against him because he complained about discrimination.   In the handwritten narrative section of the Complaint, Plaintiff merely stated that he had been "monitored or/under a certain type of surveillance in other words treated differently than other [housekeeping staff]," and that he had received "unknown complaints which led to allegations against [him]."[21] Plaintiff also stated, though, that he would like the chance to "explain [his] complaint in a more rightfully manor and [would] do so if allowed."[22]  Plaintiff's handwritten narrative did not reference any discrimination on the basis of race, gender or disability.

On February 14, 2014, Defendant filed the subject motion [#8] to dismiss.  Defendant correctly observes, at the outset, that "there are no facts in the narrative portion of the Complaint which even remotely describe Mr. Watkins' alleged disability, his termination, sex harassment, or any discrimination whatsoever."[23]  Defendant also accurately states that the Complaint in this action differs markedly from Plaintiff's NYSDHR complaint, "which asserted that RGH discriminated against him based on his race/color or ethnicity (the one set of protected characteristics that Mr. Watkins does *not* raise in his federal complaint)."  As Defendant further asserts, neither the administrative complaint nor the Complaint in this

[20]See, Complaint [#1] at p. 4.

[21]See, Complaint [#1] at p. 4.

[22]See, Complaint [#1] at p. 4.

[23]Def. Memo of Law [#8-2] at p. 2.

action actually describes any form of discrimination based on any protected characteristic, or any retaliatory action. Defendant therefore maintains that the Complaint fails to state a plausible claim of discrimination.

Defendant further contends that the Complaint should be dismissed for failure to exhaust administrative remedies, since the claims in the Complaint, for sex/gender and disability discrimination, are not reasonably related to the claim in Plaintiff's administrative complaint, which only alleged discrimination on the basis of "race/color or ethnicity."[24][25]  In that regard, Defendant notes that the NYSDHR's "Determination and Order After Investigation" indicates that it viewed Plaintiff's administrative complaint as alleging only "an unlawful discriminatory practice relating to employment because of race/color."[26]

In reply to Defendant's motion, Plaintiff submitted both a response [#9] and a sur-reply [#11], which together consist of eleven handwritten pages. The response [#9] begins, strangely, by referring to Plaintiff's medical records, which he claims not to have, and alluding to a medical test that Plaintiff took while he was employed by Defendant. The response does not indicate what the test was, what the results were, or how such test relates to this action, if at all. The response further indicates that there was a malfunctioning faucet in Plaintiff's work area of the hospital, which was known to be unsafe for drinking, and states: "The reason I brought this to your attention cause I believe this is the results of

---

[24]See, Docket No. [#8-1] at p. 6.

[25]Defendant also contends that the Complaint should be dismissed for failure to exhaust administrative remedies, since Plaintiff did not attach an EEOC right to sue letter to his Complaint.  However, Plaintiff subsequently provided the Court with his right to sue letter, dated April 26, 2013.  As discussed further below, however, Defendant is correct that Plaintiff failed to administratively exhaust the particular claims that he is now attempting to raise in this action.

[26]See, Docket No. [#8-1] at p. 90.

a chemical reaction I have been exposed to which is causing me to have blood work done."[27] Putting aside these strange statements, the response does not give any plausible indication that the termination of Plaintiff's employment had anything to do with Plaintiff's medical condition or testing.

The response then attempts to clarify the nature of Plaintiff's "sex discrimination" claim by stating that the ward on which he worked was staffed primarily by females and "a few males."  Plaintiff states, though, that a Black female employee had a verbal disagreement with her supervisor, and was permitted to transfer to another area of the hospital.  Plaintiff suggests that it was discriminatory to allow the female employee to move to another job location, while he was terminated.[28]  The response, however, does not allege that Plaintiff and the female employee engaged in similar misconduct or had similar disciplinary/work histories.  The response also does not address the fact that Plaintiff's administrative complaint did not assert sex discrimination.

The response next attempts to clarify Plaintiff's "harassment" claim, by indicating that he had a positive work record for this first eighteen months that he worked at the hospital, until an African American supervisor was hired, who made several complaints about Plaintiff's work.[29]   Though his Complaint does not indicate so, Plaintiff is himself African

---

[27]See, Docket No. [#9] at pp. 1-2.

[28]See, Docket No. [#9] at p. 3 ("I was [n]ever given a opportunity to move or change my area.").

[29]See, Response [#9] at pp. 4-5 ("No problems existed until a third supervisor was hired who happen to be a African American who I knew of or possibly heard about from the neighborhood area. . . .  the allegations and written claims against me I couldn't help to notice that most of them came from the third supervisor[.]").

American.[30]   Plaintiff indicates that such complaints led to him being placed on the two PIPs, which he characterizes as harassment.   The response further alleges that the conditions of Plaintiff's PIPs were discriminatory, since they made Plaintiff feel "like a criminal," and since Plaintiff was the only employee who had such conditions placed on him, as far as he knows.[31]

Lastly, the response [#9] purports to explain Plaintiff's retaliation claim.  In that regard, the response indicates that after Plaintiff experienced disciplinary actions, he "beg[a]n to share [his] experience with other employees about what [he] should or could do or if they ever experience this type of difficulties."[32] [sic]  The response further suggests that "word may have got around [be]cause [Plaintiff] didn't get [a] quarterly raise in the beginning of the month like the rest of the employees."[33]  The response, though, does not allege that Plaintiff engaged in protected activity, nor does it attempt to explain why it would be more likely that he failed to receive a raise for *discussing* his disciplinary problems with co-workers, than that he failed to receive the raise precisely because of the very disciplinary problems that he was discussing.

On March 4, 2014, Defendant filed a reply memorandum of law [#10], which reiterates the points raised in Defendant's earlier brief, and argues that Plaintiff's response [#9] does nothing to cure the deficiencies of the Complaint.

---

[30]*See*, Response [#9] at p. 2.

[31]*See*, Response [#9] at pp.  5-6.

[32]*See*, Response [#9] at pp. 6-7.

[33]*See*, Response [#9] at p. 7.

On March 13, 2014, Plaintiff filed a sur-reply which, while generally not permitted without the Court's permission, the Court has considered in light of Plaintiff's *pro se* status. The sur-reply, though, does nothing to help Plaintiff's cause.  In that regard, the sur-reply begins by vaguely suggesting that Plaintiff is not presently in a position to describe his ADA claim, the nature of which is unspecified, "[be]cause test work is still being done which will determine the cause and effect."[34]   The sur-reply then vaguely alludes to some kind of interpersonal dispute, which is never explained, that Plaintiff may have had outside of work:

> I don't think any supervisor, or [higher] up bosses and co-workers have a right to interfere with another employee's rights.   I believe if there's a misunderstanding between two co-workers outside the place of employment I believe it should be resolved, mediated or handled by the two co-workers by a private and personal manner if a problem existed away from the job especially when it comes to affairs, relationship or family and friends.[35]

Apart from such statements, the sur-reply essentially reiterates Plaintiff's contention that it was improper for Defendant to place him on a PIP.

Having reviewed the parties' submissions, the Court finds that oral argument is not necessary. *See*, Local Rule of Civil Procedure 7(c) ("In its discretion, the Court may notify the parties that oral argument shall not be heard on any given motion. Thus, the parties should be prepared to have their motion papers serve as the sole method of argument.").

DISCUSSION

Defendant has moved to dismiss this action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The legal principles applicable to such a motion are clear:

---

[34]*See*, Sur-reply [#11] at p. 2.

[35]Sur-reply [#11] at p. 2.

> Federal Rule of Civil Procedure 8a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007); *see also, ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007 ) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' ") (*quoting Bell Atl. Corp. v. Twombly* ) (footnote omitted).   When applying this standard, a district court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir.1999), *cert. denied*, 531 U.S. 1052, 121 S.Ct. 657 (2000).

"While a *pro se* complaint must contain sufficient factual allegations to meet the plausibility standard, this Court affords *pro se* litigants 'special solicitude' by 'interpreting [a *pro se*] complaint to raise the strongest claims that it suggests.'" *Jackson v. Pfau*, No. 12–324–pr, 523 Fed.Appx. 736, 737, 2013 WL 1338712  at *1 (2d Cir. Apr. 4, 2013) (table) (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir.2011) (alterations and quotation marks omitted)).

_Failure to Exhaust Administrative Remedies_

Defendant alleges, in part, that this action, purportedly asserting claims for disability-based and gender-based discrimination, should be dismissed because Plaintiff failed to exhaust his administrative remedies as to those claims before the NYSDHR and the EEOC. Failure to exhaust administrative remedies is an affirmative defense, and affirmative defenses are generally not a basis to dismiss an action pursuant to Rule 12(b)(6).  However, "[a] party may raise an affirmative defense . . . in a Rule 12(b)(6) or Rule 12(c) motion if the facts supporting the defense, such as the relevant dates, appear on the face of the challenged pleading." _The Estate of Mantle v. Rothgeb_, No. 04 Civ. 4310(KMW)(HBP), 2007 WL 4548127 at *4 (S.D.N.Y. Nov. 6, 2007) (_citing United States v. Space Hunters, Inc._, 429 F.3d 416, 426 (2d Cir.2005)).

It is undisputed that plaintiffs asserting claims under federal anti-discrimination statutes, such as Title VII and the ADA, must exhaust their administrative remedies before filing their actions in federal court. _See, e.g., Hoffman v. Williamsville School Dist._, 443 Fed.Appx. 647, 649 (2d Cir.2011) ("[P]laintiffs asserting ADA claims must exhaust all available administrative remedies[.]") (citation omitted).  Plaintiff did not exhaust the claims in this action, since they are different from, and not reasonably related to, the claims that he pursued, and which the NYSDHR/EEOC actually investigated, in the administrative proceeding. _See, Mathirampuzha v. Potter_, 548 F.3d 70, 76 (2d Cir.2008) ("The exhaustion requirement is relaxed under the 'reasonably related' doctrine if, _inter alia_, the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.") (citation omitted).  Accordingly, the subject action must be dismissed for that reason alone.

*Failure to Plausibly State a Discrimination Claim*

Defendant also maintains that Plaintiff has failed to state an actionable claim of disability discrimination or retaliation under the ADA, or an actionable claim of gender discrimination or retaliation under Title VII. The Court agrees. Moreover, even if Plaintiff were to attempt to assert a claim of race discrimination, which he did in his administrative complaint but not in his complaint in this action, he has not pleaded facts to make such a claim plausible.

Moreover, Plaintiff has not pleaded facts indicating that he has a disability under the ADA, or that any such disability played a role in the termination of his employment.[36] Nor has Plaintiff alleged facts showing that he suffered any type of actionable sex-based discrimination under Title VII. [37] On that point, at most Plaintiff has alleged that a female employee, who engaged in a single act of misconduct different from that which Plaintiff repeatedly engaged-in, and of whom there is no reason to believe that she is similarly situated to Plaintiff with regard to disciplinary history, was given an opportunity to transfer

---

[36]"To establish a prima facie case for discriminatory discharge under the ADA, a plaintiff must show that: (1) his employer is subject to the ADA; (2) he is a "qualified individual" with a disability within the meaning of the ADA; (3) he could perform the essential functions of his job with or without reasonable accommodation; and (4) he was fired because of his disability. *See, e.g., Brady [v. Wal–Mart Stores, Inc.*], 531 F.3d [127,] 134 [ (2d Cir.2008) ] (*citing Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir.2004)); *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 149–50 (2d Cir.1998). Moreover, to establish a prima facie reasonable accommodation claim, a plaintiff must show that: "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [his] disability; (3) with reasonable accommodations, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Monterroso v. Sullivan & Cromwell, LLP*, 591 F .Supp.2d 567, 577 (S.D.N.Y.2008) (*citing Rodal v. Anesthesia Grp. of Onondaga, P. C.*, 369 F.3d 113, 118 (2d Cir.2004))." *Fahey v. City of New York*, No. 10 Civ. 4609(ILG)(MDG), 2012 WL 413990 at *5–6 (E.D.N.Y. Feb. 7, 2012).

[37]"A plaintiff establishes a prima facie case of discrimination [under Title VII] by showing that he or she (1) is a member of a protected [group] ....; (2) was qualified to perform the duties required by the position; (3) was subjected to an adverse employment action; and (4) the adverse employment action occurred in circumstances that gave rise to an inference of discrimination. *See Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir.2003)." *Gilderhus v. Concentrix Corp.*, 825 F.Supp.2d 414, 427 (W.D.N.Y. 2011).

to a different work location.  And with regard to the retaliation claim, Plaintiff has not shown that he engaged in protected activity, let alone that such protected activity was related to Defendant's decision to terminate his employment.[38]   Accordingly, the Complaint fails to state any plausible claim.

### Motion to Re-Plead

Although the *pro se* Plaintiff has not requested leave to file an amended complaint, the Court is mindful that dismissals under FRCP 12(b)(6) are usually granted with leave to replead, unless the Court determines that such leave would be futile. *See, Stern v. General Elec. Co.*, 924 F.2d 472, 477 (2d Cir.1991) ("[D]ismissals for insufficient pleadings are ordinarily with leave to replead.") (citation omitted); *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir.2007) ("A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.").   A request to replead is futile where the problems with the complaint are substantive, and would not be cured by better pleading. *See, Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("The problem with Cuoco's causes of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.").

In this action, any attempt to replead would be futile, for the reasons already discussed.  Plaintiff has already taken several opportunities to explain why he believes he was discriminated against, both in this action and in the administrative proceeding, and none

---

[38]To establish a prima facie case of retaliation,  the Plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *McNamee v. Starbucks Coffee Co.*, 914 F.Supp.2d 408, 420 -421 (W.D.N.Y. 2012) (citations and footnotes omitted).  Talking with one's co-workers about one's disciplinary problems is not protected activity, and even if it was, Plaintiff has not plausibly pleaded that Defendant was aware of such conversations, or that Defendant took any retaliatory action as a result of the conversations.

15

of those explanations have asserted facts that would support any type of actionable discrimination claim.   Accordingly, there would be no point in allowing him a further opportunity, and leave to replead is denied.

CONCLUSION

Defendant's motion [#8] is granted, and this action is dismissed with prejudice. The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962).  Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.  The Clerk of the Court is directed to terminate this action.

SO ORDERED.

Dated:      March 25, 2014
            Rochester, New York

                                             /s/ Charles J. Siragusa
                                             CHARLES J. SIRAGUSA
                                             United States District Judge